May it please the Court, Counsel. As mentioned, with permission of the Court, what I'm going to do is focus my time on the Endangered Species Act issue. Can I ask one more procedural question? Are you going to, are any of you going to address the moteness question, or are you going to do that in rebuttal, or how are you going to do that? Your Honor, I think my preference would be to do that in rebuttal if we have time, particularly because in the Endangered Species Act argument no moteness question has been raised. That's one of the reasons why I think it actually makes sense to start with it. There has been no threshold moteness issue raised about that particular claim. It presents what we believe is a rather straightforward legal issue under the Endangered Species Act and the regulations. In our view, the way in which the government handled that issue, particularly focusing on the conservation actions as they've been described from Ruby, places a square peg in a round regulatory hole. It's, we believe, flatly contrary to the regulatory scheme. There's no precedent from this or any other court supporting how they addressed it, and we believe it presents a rather, frankly, straightforward basis for at least a remand for the agencies to sort out how they were approaching this issue and what the underlying legal rationale for it. Now, let me, if I can, begin with Well, let me understand what you're saying then. You're saying that you're not, you're arguing only that we need an explanation for why they thought they could do it this way from the agencies themselves rather than from their lawyers who have given us an explanation. They have. It's not one that happens to be anywhere in the record. I think even their explanation, as I'll get to in a moment, doesn't make a heck of a lot of sense. And I think recognizing the crucial but nonetheless limited role that the court has, which is to look at whether or not the agency decision is adequately explained and consistent with the regulations, the furthest we're asking the court to go, but we believe it's as far as the court should go, is to say that the explanation is not consistent with the regulations or the agency's own handbook. It's internally inconsistent, and there needs to be some basis for the agency's rationale as set forth in the record, and that, of course, is consistent not only with Supreme Court precedent, Laurie and State Farm, a long line of APA cases, but many of this court's ESA decisions, including most recently the Courts Wild Fish Conservation decision, Gifford Pinchot and others who have said if we can't understand the agency's action, we need to remand it. Now, with that in mind, if I can go immediately to what I think is a gaping hole in not only the record, but also the government's and RUBY's explanation of their action in this court, and that is how actions which were taken by RUBY as part of their effort to address species impacts, particularly fish impacts, can be regarded as cumulative impacts for purposes of the biological opinion, and after I explain to the court why they can't possibly be reconciled with the plain terms of the regulations, then with the court's permission I'll explain why that matters, why it makes a huge difference where in the biological opinion they put that discussion. Let me start with the first point. I think it's crucial to understand exactly how it is that this cannot be considered to be a cumulative effect. Ordinarily, of course, one thinks of cumulative effects under the S.J. NEPA as adverse effects, unconnected to the agency action at issue, and in fact, that's exactly what the Fish and Wildlife Service regulations say. If you look at the regulations themselves, and this is in the addendum submitted by the Center for Biological Diversity, AB 29, it's defined as cumulative effects are those effects of future state or private activities not involving federal activities that are reasonably certain to occur within the action area of the federal action subject to consultation. Now, there's some discussion by our opponents on the other side as to whether or not these are reasonably certain to occur, and we think there's a problem with that. But the most obvious reason why this can't fall within cumulative effects is, according to them, this is not only involving federal activities, it's part and parcel of federal activities, and rather remarkably in their responsiveness. I mean, that's not the way it's usually done in the sense that if there have been tree cuttings before, for example, which are federal activities in a way because they're primitive, those are part of the cumulative effects, right, usually? Well, usually what those are considered to be is either part of the action itself. No, those are earlier ones. Earlier ones get incorporated into the baseline is the way they actually approach it. You mean for biopurpose. Correct. But cumulative effects are defined under their regulatory scheme as non-federal activities, and the rationale for that, Your Honor, in the normal sense, is that those will be subject to some separate consultation duty down the road. And the fact of the matter is that this is a weird situation because they're trying to use cumulative effects to address what they consider to be positive benefits for this species. This argument is sort of aside from the fact of whether this is enforceable or how it's enforceable. Are you going to get to that? Correct, Your Honor. And just to tie this into our overarching point, just to be clear about this, they come back and say, look, this is enforceable under other statutory mechanisms. Our position is that that makes no difference. Under the ESA it has to be enforceable under the ESA statutory mechanism. But the point I'm trying to make is their argument highlights a crucial contradiction in their position because by coming back and arguing that it's enforceable under the FERC license, which, by the way, specifies that these conservation actions are considered to be part of this project, which is exactly what the FERC license says, the BLM record of decision says that the action that they're approving, the right-of-way, is contingent on carrying out various measures, including these conservation actions. The point I'm trying to make here is the contradiction in their position is that by making that argument, they're necessarily excluding these kinds of activities from the definition of cumulative impacts in the statute. So what they basically do is undercut their legal rationale for including them within the definition. And at the same time, what's your honor, at the same time, what they can't do is explain why they shouldn't be enforceable under the ESA regulatory scheme. The FERC, the BLM rule of decision does seem to be contingent on this agreement, but it wasn't so clear to me what the FERC certification was because it seems to be a timing problem there in terms of what was actually in the documents at the time of that certification. Well, your honor, if you look at the county's excerpts of the record, and I apologize that we've got various documents and different excerpts, I think it's sort of avoidable, but in the county's excerpts of the record, which is page 77, there is at the end of paragraph 100, before 101, a rather, I think, compelling statement that pretty much answers that question. And that is that the FERC says, and this is in the license decision, it's not a preliminary statement by some agency employee, now that Ruby has filed this commitment to adhere to these agreements, they have become part of the authorized project. Once executed, the measures in the agreements will be binding on Ruby and enforceable by the commission. And then they go on in their conditions and refer to this as one of the explicit conditions in the same excerpts of the record. Actually, they refer to it as condition one that it's incorporated into, the very first condition for the grant of the license. So, you know, any notion that this is not made part and parcel of the project and designed to offset the adverse impacts of the project is belied by their own decision document. And as Your Honor points out, BLM did exactly the same thing. Could you clear something up for me? I'm a little unclear. You said earlier that this has to be enforceable under the ESA statutory mechanism itself and that other methods of enforceability, whether it's the record of enforcement of the record of decision or enforcement within the FERC licensing scheme, is not sufficient. What is the source of that requirement that it has to be ESA enforceable itself? I think to answer that question, Your Honor, let me slightly amend what I said. There's one of two ways the agency can go. If they're going to rely upon these to offset the adverse impacts, which is clearly what they did, either it has to be enforceable in ESA because they're relying upon them for a no jeopardy determination. And I think that is compelled by Gifford-Pinchot. It's compelled by the National Wildlife Federation decision from this court. It's compelled by the court's recent decision of Wild Fish Conservancy. It's compelled by the agency's own regulatory scheme, and particularly its definition of interrelated effects, which says that you have to consider the effects of the action, which includes all effects, including those which would not occur but for the effects of the action. And their addendum, the handbook, also says that. The other way the agency can go, just so I'm being very clear about my answer to Your Honor's question, because I think it's a crucial one, the other way they could have gone, and perhaps even go on remand, is to explain and clarify if that's what they would be doing. They certainly did it the first time around, that they're not relying upon these conservation measures in making their no jeopardy determination. It seems to me they had one of two pathways in this case, and they came up with a third rather peculiar one. The two pathways were either saying that we are relying upon them, in which case they have to be enforceable under the ESA scheme, or we're not, in which case our no jeopardy finding doesn't depend upon them. Instead, they stuck them in the cumulative impact section, which does not have a basis for enforceability. And if I could just finish one aspect of this, I think the other crucial thing to look at is the reinitiation criteria. And these are discussed in Sierra Club versus Marsh and other decisions from this court. And what they say is that it's crucial for the Fish and Wildlife Service, the expert agency, which, by the way, came up with these measures. I know the reason why they're clearly federally involved measures. The expert agency, putting citizen suits to one side, must be in a position to take the lead role in ensuring that measures that are being adopted for species protection are actually being carried out. Now, Ruby says point blank in its brief that their failure to carry out these conservation measures would not be a basis for the initiation of consultation, because they would not be in the terms and conditions, and they would not be part of the agency action. The government studiously avoids saying anything about that issue. Doesn't that jeopardize their first certificate? I mean, isn't that, aren't they in jeopardy there, and isn't that the whole? It conceivably might. And I think what that reinforces, they talk about a million-dollar fine per day. I think, Your Honor, what that reinforces is that this is clearly a federal action, so it can't be a cumulative effect on the definitions I said. But I think the crucial point is, and the other case I would refer to, and I think it's very important, is the Selker case. The only precedent that they cited as authority for this, and in that case the court said it was okay because it was an enforceable term and condition, the violation of which would result in reinitiation of consultation. Does this problem come about because we have two agencies here, at least, that are responsible, FERC and BLM? And if FERC can enforce it, the FERC could also not enforce it, presumably. Even if it were a condition, FERC might choose to impose the fines or might not. And so the real question, but on the other hand, BLM also has responsibility here, and therefore the question is, can they enforce it? That's absolutely right, Your Honor. And I think, actually, in addition to that, you can have disagreements between FERC and BLM on the one hand and the Fish and Wildlife Service on the other. And some citations in response to Judge Smith's question, in this record, excerpts of the record 339, the CBD excerpts, and excerpts of the record 386, are where the Fish and Wildlife Service disagreed with FERC on the one hand, as to the impacts of certain activities on the fish, and disagreed with the Corps as to whether or not there even should be an individual permit. What it highlights, as Judge Berzon, I think, is suggesting, is that you can have disagreements between those agencies and the service, and more than that, the service is the export agency under this regulatory scheme. It shouldn't have to depend upon FERC or BLM to effectuate those parts of the license or the right-of-way. That's not what the ESA scheme is all about, I would respectfully suggest to the Court. Just to be, because I'm aware of more novices of this regulatory scheme than we should be, there's also a provision of the ESA that specifically talks about conservation action, Section 10, right? How does that fit in here? Well, Section 10, Your Honor, is when there's no federal involvement. It's for an incidental take permit that's being sought by a private party with no other federal involvement, and they're asking for authorization to engage in what would otherwise be a violation of Section 9. I don't think it has any direct relationship here, because everybody agrees that this is interwoven with federal activities. It highlights, however, that even in that scheme, the service, the Federal Law Service, is the entity that ultimately makes that decision and decides whether to issue an incidental take permit. So here is the agency with expertise, and under the scheme should not be reliant upon these other agencies, even if they have all the best of intentions. And in addition, of course, to the ESA, there is a citizen supervision that otherwise would not be something that would be available to those who want to also exercise the right to enforce the statute. General, this issue goes to a lot of the issues that are being argued here. It's FERC's environmental impact statement. FERC is the lead agency, and it consults with these various other agencies. And if you look right at the EIS itself, it's under the moniker of FERC, and then all of the other agencies are listed as contributing agencies. But you're arguing as if it's each one of these contributing agencies should have an independent enforcement ability for everything that's in the EIS. And I'm just – that seems like a very confusing enforcement scheme to me. It seems like the lead agency should be the agency that does the enforcement. Your Honor, I think I understand your concern. My only answer would be that our argument doesn't go that far. Our argument is that for one very specialized kind of impact, endangered species impacts, where Congress was about as explicit as it could be, that the expert agency for those impacts is the Fish and Wildlife Service.  And this is the consultation, and under the consultation scheme created by Section 7, the biological opinion is written by the Fish and Wildlife Service. Not only that, they wrote the conservation actions as Ruby concedes in their brief. So it's particularly peculiar to have FERC essentially in the position of enforcing the conservation measures written by another agency that also wrote the biological opinion, which is the operative document for purposes of endangered species implementation. I'm already over the time that I don't want to get in trouble with my colleagues. Thank you very much. Thank you. May it please the Court, Sam Hops for the Petitioner of Fort Bidwell Indian Community. This case – Your argument for how long? For 10 minutes, Your Honor. This case is about the adverse impact on the Fort Bidwell tribe's human environment and their cultural resources by DLN's decision to grant a right-of-way and temporary use permit for the Ruby Pipeline, in violation of both the National Environmental Policy Act and the National Historic Preservation Act. I intend to address primarily the NHPA claims here this morning. The tribe has strong cultural, social, and economic ties to their lands, including the lands where the Ruby Pipeline has been constructed. For many centuries, the tribe has lived off of and subsisted off of these lands. Now, their long-held cultural, social, and economic practices tied to the places where they live are in jeopardy. This includes the Beryl Springs traditional cultural property that was identified and evaluated in the environmental impact statement prior to the decision being made. It also includes the Big Valley traditional cultural property, which was identified to the BLM, but neither BLM nor FERC nor Ruby evaluated the Big Valley TCP. Because the BLM and FERC failed to mitigate the harm and to identify mitigation before approving the project, they violated both the National Environmental Policy Act and the National Historic Preservation Act. Well, but doesn't the BLM meet its obligations under the NHPA by considering and adopting mitigation measures where the pipeline would have adverse effects? No, Your Honor, because at the time that they made the decision to grant the right-of-ways, they had not actually adopted any memorandums of agreement or any historic property treatment plans that would govern the mitigation of the effect on those properties. Those documents were entered into after the decision was made, and both NEPA and the NHPA required that the agency fully consider and thoroughly evaluate the impact of its actions on those historic properties and on the human environment I thought the whole point of the agreement was to recognizing that that might be a phased project to provide for the post-approval implementation, finding and implementation of mitigation efforts so that the assumption is that you're not going to have done, have identified everything in advance. Is that not right? Well, those MOAs that are put in place to govern large projects such as this one that cover expansive areas are put in place where it's not possible because the properties have not been identified prior to the decision being made because of the expansive area. But these two properties had been identified to BLM and to FERC, had been partially studied in the case of the Beryl Springs property. The request to have them studied in the case of the Big Valley property was ignored or overlooked, but in any case was not done. And because those two properties were known to BLM and to FERC, they had the responsibility under the statutes to evaluate them to address the adverse effects and to discuss mitigation for those properties, and not only that, but to consult with the tribe on those things as those steps were being carried out to resolve the adverse effects on the properties. We've got two tribes here, right? Yes, Your Honor. Which one are you? The Fort Bidwell tribe, Your Honor. You're for the Fort Bidwell tribe. Okay. Well, I guess my worry about your arguments as it relates to the Fort Bidwell tribe, isn't your argument that they failed to identify a lead official representative for consultation? Isn't that your argument? That is one of my arguments, Your Honor. And properly delegated the consultation authority to Ruby? That is an additional argument. Well, I guess I'm trying to figure out in that instance why those have merit. Because FERC is the lead agency, and again, my colleague kind of stole my question in the last colloquy, but FERC is the lead agency responsible for consultation, did what they had to do. The regulations implementing the NHPA made clear that the consultation by Ruby was impermissible, so I guess I'm trying to figure out how we get to your problem. Your Honor, we get to the tribe's issues because in order for the agencies to delegate the consultation authority to a lead agency, they have to identify that agency as the lead. And then those agencies together. Is that what federal law does, establishes FERC as the lead agency? The National Gas Act establishes FERC as the lead agency for the certificate and for environmental review. But the National Historic Preservation Act requires that the lead agency identify the agency official responsible for carrying out Section 106 and requires that the cooperating agencies also delegate their National Historic Preservation Act responsibilities to FERC. And that was not done in this case. Instead, BLM. As I understand the regulations, those regulations, which are those that implement the NHPA, which I understand you're here to talk to me about, they make clear that a consultation by Ruby is permissible as well. Consultation by Ruby is permissible, but the federal agency remains responsible for that consultation. They're allowed to initiate consultation. They're allowed to do studies and provide information, which they did here. However, what they cannot do is fulfill the agency official's responsibility to consult with the tribe. FERC never sent an individual to consult directly with Fort Bidwell. FERC held a meeting on October 28th of 2008 with multiple tribes. At that meeting, the tribe's president told that individual, the FERC point of contact for the project, that it was not appropriate government-to-government consultation with the tribes. That individual told the tribes that they would just have to agree to disagree and then went on to discuss the project with them. This is key because government-to-government consultation is to allow the tribe access to the decision maker so that they can discuss their concerns, talk about the project, talk about how it impacts them, and work with that individual both to identify, evaluate, and then to resolve adverse effects. As a practical matter at this time, what is it that could occur that would help, that would change anything that the tribe is concerned about? This case is close to the mootness issue. Well, somewhat close to the mootness issue. On remand, the tribe- It also goes to the timing issue as to whether it mattered when the consultation occurred. It does matter when the consultation occurs because the consultation- The question goes to both issues. Yes. It goes not only to mootness, but it also grows to the timing and whether the timing makes any real difference here. I thought she's trying to make you know so you can answer the questions. It goes to the issue of identifying- I should have said it before, but I did it after, but whatever on the ground, what on the ground difference would it make if they did it before, after, or now? On the ground, it would make a difference because the tribe would have been allowed to be involved in the resolution of the adverse effect to the historic property before the decision was made so that the tribe knew for certainty what was going to happen there and how it was going to happen. Okay, but it didn't happen, so the question is- Let's assume you're right for the moment. It didn't happen, so now what I want to know is how do you turn back the clock, both in terms of the fact that it didn't happen before and also the fact that the project is now built? The project is now built. It will have ongoing impacts to the traditional cultural property that go on into the future. It's very much like Tyler- This is what I'm trying to get at. You cannot now have consultation before the project, the decision is made, and you even cannot have consultation before the project is built. The best we can do now is to have the consultation now. So what I'm asking you is if you have consultation now, how does that solve your problem? It would solve the problem by allowing the tribe to work with BLM, with FERC, and with Ruby to come up with- You have had consultation. You have had consultation since, right? Not on the resolution of adverse effects to barrel springs or to the Big Valley TCP. The Big Valley TCP remains unidentified. You've never had consultation on the issues that you want to have consultation on? Yes, Your Honor. But you had some consultation. It just wasn't the consultation that you wanted? It was not the full meaningful consultation that's required by the National Historic Preservation Act. I want to be sure I understood what you said because I think you said that FERC is the lead agency and that we needed to delegate the consultation role to whom? To BLM? No, FERC delegated part of their consultation responsibilities to Ruby. And then I thought you said then in order for FERC to do any consultation with the tribe, it had to be delegated back to them? Did you say that? No, FERC remains responsible for it. And so does the BLM because the BLM is responsible for complying with the NHPA and its decision to grant a right-of-way and temporary use permit. It remains independently responsible just like it is independently responsible to adopt the FEIS, regardless of whether FERC is the lead agency or not. But ultimately, just to clarify, your position is that at no time, before the decision was made, after the decision was made, under the MOA or now, has there ever been an appropriate consultation? Yes, Your Honor. And I'd say my time is up. Thank you very much. Thank you. May it please the Court. My name is Clare Russell, and I represent the Summit Lake Paiute Tribe in these proceedings. This case is about whether the United States can get off scot-free after knowingly violating the express provisions of two federal laws and allowing a private company to desecrate and destroy sacred sites that northern Paiute people have used for thousands of years. In my limited time this morning, I would like to focus on two reasons why this Court should vacate the BLM's July 2010 rod and December 2010 amendment. First, the BLM violated both the NHPA and NEPA when it failed to analyze the impact that the pipeline would have on the Summit Lake TCP. And second, BLM violated the NHPA by failing to consult in good faith with the tribe on how to resolve adverse effects to the TCP. There are two federal statutes that require BLM to analyze impacts to the tribe's sacred sites. Section 106 of the NHPA and its implementing regulations require agencies to identify sites eligible for the National Register and assess the adverse effects that may be caused if a project is approved. NEPA's requirements are similar, but they are broader. A federal agency must analyze the effects on a human environment that might occur if federal approval is given for the project. As a result, CEQ regulations make clear that the agency must consider impacts to not only historic and cultural sites, but also to the people that use them. Are you dealing with both the original and the reroute? I am, Your Honor, and I would like to make a point related to some of the questions that were addressed to the Fort Goodwill tribe. That is, neither the United States nor RUBY have argued in the second case, the reroute case, that the BLM does not have the authority here, that the BLM is not the one on the hook. They all recognize that BLM is responsible for that reroute in complying with the National Historic Preservation Act. And in complying with that, BLM could have done other things to adjust to the issues you were raising. Because the actual routing seems to be up to the BLM. Right. The area north of the Summit Lake Reservation contains only federal lands, and so it was the BLM's decision and it was exclusively BLM consulting with the tribe about that reroute. As to the reroute, I think that is one where I really want you to tell me why you don't think that's just a moot case. I mean, if I read the reroute and I read what you did with the reroute, I want to figure out why that isn't just right up the line with Feldman v. Bomar and Headwaters v. the BLM. Well, Your Honor, I agree that it's unlikely that we are, at this point, going to get a reroute of the pipeline in a different location. Isn't that the only thing you ever alleged or sought in that particular case? Not at all, Your Honor. I didn't see anything in your complaint that led to mitigation efforts. All I saw in your complaint was reroute the pipe or quit. In the petition for review in the second action, we merely stated that the BLM had violated the NHPA and NEPA. We asked that their approval be vacated and that they comply with federal law. And so there are two points that are not moot, or at least under the NHPA, there's a separate requirement that federal agencies consult with tribes not only on identification of sites, but also on resolving adverse effects. And the reality is that the pipeline is now located through what we believe to be the Summit Lake TCP, and there are still ongoing effects that Summit Lake Tribal members are suffering as a result of this. Well, I guess my worry about this is that when we put the pipe down, which the pipe is down now, the pipe's underground, any damage to reroute the pipe is going to be a damage to the TCP as much as anything. I guess I'm trying to figure out what is it I can do in mitigation. And that's what we did notice in our motion for mootness, so we were not claiming that the tribe would be interested in pulling up the pipeline again and doing further damage. But the reality is that they could analyze the impacts on the TCP that have been caused by the pipeline now and attempt to mitigate them. For example, even worst case scenario, if the TCP, if the power of that site is totally destroyed, which we don't believe it is, but even if it is, the federal government could seek then as mitigation measures to protect the limited other taker sites that the tribe has that are on federal land, because obviously there are only a limited number of sacred sites that remain that are tied to federal land. So that shows you- You're talking other sites and other projects? I'm saying that BLM has the authority under its mitigation measures to analyze the impacts to the TCP and to propose mitigation even as drastic as we should put something in place to protect this other site to ensure that some high tribal members have a place to practice the religious ceremony. What do you mean by other site? I mean, this is, I think we're all struggling with this. Are you talking about the site where the pipeline is now? Are you talking about a site closely adjacent to the site? Or are you talking about some unrelated other site someplace on federal land? I mean, I'm giving a worst case scenario. I'm essentially saying it's sort of anywhere on BLM land. If you look at a map, you'll see the Bureau of Land Management essentially controls all the land surrounding the tribe's reservation. But the reality is the BLM could put into place mitigation measures just on that site, for example, limiting access to the pipeline by Ruby, setting up a procedure for, you know, what actions should be followed if they need to dig up a portion of the pipeline again to repair it. So there are several ongoing impacts to the actual area we're talking about north of the reservation that could be mitigated in this case. This is a backup question, but you have the reroute case, but you also continue to be challenging the original decision and the FEIS in particular with regard to the dealing, how it dealt with the cultural aspects of the tribe's concerns. So how do those pieces fit together? Well, I think the arguments sort of dovetail with each other. First, the agency was required to complete a supplemental EIS prior to issuing that July 2010 ROD. With regard to the reroute. Say again? With regard to the reroute. No, with regard to the original route of the pipeline and with regard to the reroute. If you look at the administrative record in this case, and these are documents that were just produced by the United States late in the game in March, April, and May of this year. If you look at the administrative record, it shows you that BLM acknowledged the existence of the TCP starting in March of 2010 after a site visit. There's a really important consultation session from April where there's an audio recording in the administrative record, and you hear BLM official Mark Hall, who is the Native American coordinator, tell the tribe, yes, this site's eligible for the National Register. We now recognize that. And he also tells the tribe it's going to have a significant impact on the TC because it's going to run right through it. So they acknowledge at that point, months before the original ROD is ever issued. What about one step further back? I mean, I gather that there was a study done which was acknowledged by everybody to be a very poor one and wasn't actually finished at the time of the original FEIS. Does all of that matter anymore? By the study, are you referring to the Gameston report? No, the one before that. The report that the tribe? No, the report, I thought it was a report that was commissioned but was terribly done and that nobody, that the agency eventually fired the people who were doing it. Was Ruby the first consultant? Yeah, absolutely. So Ruby did hire cultural resource monitors to get out on the pipeline route and determine what artifacts were there. I'll be honest with you, I do think those issues, to that extent, are moot, from the standpoint that the impacts have already happened to artifacts that are under the ground. What's important is that does not affect the issues that relate to the TCP because, you know, the artifacts, to the extent that they were found, have been excavated and stored in Nevada State Museum and so I don't think that that's a lot of issues. I think the problem that was going on here, if I understand it correctly, was the tribe was reluctant to give up information to the government because they wanted to keep that, hold that close to the vest. So everything marched forward and then on Ruby's end, they hired this consultant that didn't do a good job and that went bad and so then they got the new consultant who did do a good job but all the while things were marching along. So the consultation went on but it just, without casting blame now, it got much delayed compared to the progress of the project. I do disagree with the notion that it's the fault of the tribe for not volunteering the information earlier. If you look at consultation that's required under the NHPA, it's something more than merely sending four letters or inviting the tribe out to public meetings and asking them to disclose the location of sacred sites when there are members of the public there and members of other tribes. The reality is that there was only one face-to-face meeting between the tribe, BLM, and FERC, between any of those agencies. There was only one face-to-face meeting and it was October of 2008. And at that point, the tribe wanted to discuss the cultural resources and they were told by FERC, well, wait. You've got to wait until the environmental review process is underway because we're not really ready to address those issues just yet. Let me interrupt you just a little bit. My worry about the reroute is this. I felt like, what do you think my standard of review is of this decision by the BLM in this particular situation? Your Honor, I see that my time is up. Can I respond to your question? No. And the reason I'm asking, oh, your time is up? I thought you had ten minutes for him is all. Okay, Al. Some kind of disconnect between what we're seeing. Yes, I know. It started at 22 minutes or about there when I started, so. Well, all I was trying to do is, it seemed to me that BLM properly consulted the tribe beginning the years before the decision to reroute the pipeline. They conducted a field survey. They analyzed the effects of the reroute. All of that they went through before the reroute. And so, therefore, I'm having a tough time seeing that they did a bad job, given my standard of review. As it relates to the first time they put the pipe in, even assuming your view that they didn't get around to consulting you of when they should have, before they did anything, even after your view of when the consultation occurred, it seems to me that the alternate routes for the pipeline were still being considered. And so, therefore, I still have a tough time with your argument. Your Honor, if I may address the issue about whether consultation was proper during the reroute phase. I think the tribe would say that the BLM consulted with them to identify the TCP. What they did not do is consult with them to resolve the adverse effects. And that's a separate consultation view that you'll find in the regulations. BLM deciding the reroute, they actually worked with Ruby, the project proponent, exclusively during the months of May, June, and July. It's not until July 18th that the tribe discovers the reroute is being proposed. BLM hands them a map and shows that to them. And two and a half weeks later, Ruby's already asking the Nevada State SHPO for concurrence. So, the reality is, is the tribe, on that day, asked them to consider a different reroute, but it was never considered, because by that point, the process had gone on to such an extent that Ruby had already done the cultural resources on the proposed reroute that they had worked out with Ruby and BLM. So, I think the tribe was prejudiced by the failure to consult on adverse effects in the reroute phase. And the reality is, is we might not have been here if they had consulted sooner, because that pipeline might have been rerouted where the tribe suggested, along the southern boundary of the Sheldon National Wildlife Refuge. Okay, thanks very much. And, we finally have Mr. Rinovich, is that right? Yes, Mr. Rinovich. I need to reserve four minutes for counsel for CBD. Okay, just give your argument. We'll give some extra time for that also. Okay. Our case concerns an agreement between Ruby Pipeline and Western Watersheds Project to retire and relinquish livestock glazing along the pipeline, and those accounts adjacent to the pipeline, and BLM's failure to consider these impacts in either the FEIS, which was too late at that point, or to remand and consider it in a supplemental environmental impact statement. But it seems like this is so remote, and I guess this begins with a standing problem, in the sense that we don't know that there are going to be any withdrawals. In fact, somebody has to agree to sell their land. Some other third party has to agree to sell the land. And also, it's not entirely clear what the connection is to this project. It seems likely, or it appears that this was entered into to prevent an attack on the project. Is it contingent on the project? Well, it was actually mitigation. Contingent on the project. What if the project never happened? Was this agreement contingent on the project occurring? Yes, if it was to avoid litigation. I know, but was it in the agreement that it was contingent on the project? Well, we don't find that in the record. The agreement was never made public, so it's hard to tell. So we have no idea whether it was contingent at all? Other than the press releases that start to talk about, you know, just to end the livestock grazing along these corridors and to actually pursue it. It probably wasn't. It seemed to be contingent on them not challenging the project, but whether it was contingent on the project actually occurring doesn't even exist in the record. That's correct. So where do you get standing from when you have that degree of interaction and the connection between the BLM and this project and that agreement and something that might happen under the agreement that will affect you? Well, it's actually the reasonable probability that due to the procession and the willing landowners and success in the past that Western Watershed has had with us that it will happen, and that's a serious matter for the Western counties. But why isn't this like the standing cases in which the use of contracting welfare rights, for example, where the fact that the tax changes doesn't mean that anybody's going to really change their behavior? So if something happened here, we have no basis to think that anybody's, either that the behavior is going to occur, i.e., that they must actually sell this land to this conservancy organization, or that they're going to stop doing it if something different happens with the project or its consultation. Well, the problem with the standing argument in that respect is what is the adverse effect, and if it's the failure to consider this some procedural injury aspect. But there still has to be some reason to think that if they can, if the procedural injury changed and the project changed, that something different would happen to you, and where's that? Well, that's the reasonable probability. I mean, we have not had a case yet where it's actually happening, and if it had, you know, suggesting that there would be standing, because they've been quite quiet right now pending the outcome of this litigation with respect to pursuing these livestock relinquishments. Well, my understanding, actually, is that DLM's position is that you would have, there would have to be some environmental consideration at that point if there was actually land withdrawn from grazing. But so far there hasn't been any land withdrawn from grazing is my understanding. That's right, but not along the pipeline, but in other public land states, yes, there has been. But not in this case, not as a result of this agreement that you're complaining about. Not yet. But it's the reasonable likelihood of it happening, and we see western watersheds being extremely active in the area trying to pursue livestock grazing, and we have that in the record. And, you know, there was like 46 appeals recently, and their mission is to end public lands livestock grazing. There were appeals of what by whom? Within the IBLA throughout the area with respect to livestock. Can I say something in general to all of you? You know, this is all inside baseball stuff. Reading these briefs was like reading alphabet soup. It was practically impossible to understand them, and I don't understand what you just said. I don't know what IBLA is. Oh, I'm sorry. Western Watershed Interior Board of Land Appeals throughout the western land space. They've been extremely active in ending or trying to end renewals of livestock grazing permits throughout the west. Yes, but are they doing it in this manner, or are they doing it by doing individual appeals? They will go through individual appeals, or they'll- Individual appeals too is my understanding, or an individual. Or you could suggest that there has to be- if there was actually a withdrawal of land, you could raise issues about the environmental consideration of that, right? If it happens. But that's piecemeal, because the agreement itself was for BLM. They knew about it, and they knew their major role at the time prior to the Nevada State Director signing an election decision, and that's the requirement under the law. And this has been mitigation, and this is also related to environmental concerns. All right, and what's post-mitigation? It can be considered mitigation by Western Watershed. But it wasn't considered anywhere in the EISs or bio ops or anything else, right? That's right. That's the problem. But will be considered as mitigation for impacts to sagebrush. Essentially as a way of buying off somebody who might sue them. With respect to Western Watershed suing Ruby, it was considered mitigation, and that mitigation had to take place in the context of a NEPA analysis. Let me ask you a different question. Maybe you've covered this, but I didn't understand it. Here's what worries me. It seems to me that your threat and relinquishment of these grazing permits can be traced to the private agreement between Ruby and Western Watershed's project. And that could have happened whether or not BLM approved the pipeline or not. So then why is it that what you're raising is really a concern? It seems to me that BLM could have disapproved the project, and still Ruby could have entered into an agreement with WWP. I think actually- Exactly what you're worried about. But it was directly tied to the project. They withdrew their protest before first subsequent to the deal being made. It was directly tied to the project. I asked you that right at the outset. Yeah. If there's any record evidence that ties it to the, makes it contingent upon the project, and you said there isn't. So you can't just say that now and have us rely on it. That's exactly what I was relying on, your answer to her. No, you can't. She asked about, I'm sorry, about the agreement itself. But the record does show that they withdrew their protest following the agreement based on resolution of matters. But if, to slightly tweak Judge Smith's question, if tomorrow the BLM said, all right, we're not doing this. I mean, it's too late now. But if they had said the day after this agreement was entered into, forget it. This project isn't happening. We're withdrawing the permit. Would that have affected the agreement? We have nothing in the record to show that it would have, right? Well, other than the fact that it's a ruby, I'm just trying to establish the basis between the agreement and the project. I understand that matters entered into to prevent a challenge. But if the day after that the FERC and BLM had said we're withdrawing these permits, would the agreement have lapsed? Is there any evidence in the record that it would have? They didn't ever make the agreement public. All we know is what they have to do. These are powerful because there's no connection that suggests that they're, we understand that it was triggered by concerns about the project, but it doesn't, there's nothing in the record to indicate that it is contingent on the project. Well, other than, yes, the withdrawal from the protest or whatnot with FERC. We never, we asked for the agreement in the mediation statement. What we have is what the press releases said and the ensuing aftermath, and that's what we have. But I'm trying to tie it back to BLM knew about it. Okay. And they did not address the issue. And the e-mail said they had a, BLM will end up having a major role to play in this, and he sent it to the Nevada State Director the day before the ride was signed. And this major role by BLM was never addressed. Okay. Your time is up. Thank you very much. So you have all collectively expended your 50 minutes. We will give you, say, four minutes to rebuttal and to figure out what to do with them. Okay, thank you. Good morning. May it please the Court, Jennifer Newman for the Federal Respondents. I would like to use 30 minutes of our size 50-minute allocation and reserve the remaining 20 minutes for Mr. Bryson, who represents Ruby Pipeline. The government here did a thorough job of examining the Ruby Pipeline project and reasonably concluded that it met its obligations under all of the federal laws, as the record explains. It also engaged in thorough and respectful consultation with these Indian tribes. And I would like to address mainly the issues that the petitioners raised in their opening, although, of course, if the Court has questions about other issues that weren't discussed, I'd be happy to try to answer them. And I'd like to start by first talking a little bit about mootness and then move into the other issues in the same order the petitioners presented them. My understanding in mootness is that you disagree with Ruby with regard to one critical point about the mootness, which is the role of FERC versus BLM. I don't know that we exactly disagree. I think that our response provided a little bit more context of the fact that there is a procedure that could happen for someone to bring a concern to FERC should there be a remand and BLM made a different decision. I don't know that Ruby disagrees with that, although Mr. Bryson can, of course, address that. I think that their point was more that it's so attenuated, the process by which this would occur that the pipeline might actually be moved if there were a remand, say, on an alternatives question, that the case is essentially moot. I think even the whole question is, I mean, if there was a, if the statement wasn't adequate on the alternatives, even if you couldn't reduce the alternatives, there presumably would be still litigation and other things that you might do as a result of not having considered, of having adopted one alternative rather than another alternative without adequate information, right? I mean, that's the tenure of all of the cases, and I don't know that it distinguishes between alternative analysis or any other analysis if you have an inadequate NEPA statement. Well, and that was the point that we tried to make in our response, was that I think the real key here is that even if BLM went back to, say, redo the alternatives analysis, that is unclear, and I think the petitioners haven't presented any suggestion of what BLM actually could do if it found that it should have looked harder at, say, the BlackRock alternative at this point, now that the pipeline is in the ground. And I still think that the petitioners haven't come forward with any sort of real suggestion of what good that extra process would do now at this point. I mean, why couldn't you? We do build a different, like the reroute here, take a little piece of it, build it somewhere else, and then when you're done, you wouldn't even have to stop running the oil in the meanwhile, the gas, but once it's finished, you take the other one off and you would have a reroute. Well, I think the problem is that the way these petitioners have framed their claims, they're all about the effects of the construction on the environment, on historic properties, and the like, and those effects have happened. And going back and saying, okay, let's look at some other alternatives. And is that somewhat about the fact that there is a pipe sitting there in the middle of a stream, for example? The fact that it's there as opposed to the building of it? That's right. If you look at the brief and the standing declarations that they filed, it's all about the construction. I don't think that anyone disputes that, for example, the pipe running underneath of these streams, nobody's made any argument that there's some better way to control sedimentation from the pipe actually being in the ground. I mean, it's been covered up and it's pretty deep under there so that it shouldn't be exposed or cause any harm to fish now that it's in the ground. It was all about what would the construction effects be on these endangered species. And those things have happened. Well, let's just be clear. Nobody's asking for that, right? Nobody's asking for you to dig up any pipe or lay any new pipe in any kind of a reroute, right? Yes. As far as I can tell, yes. Okay. All right. So that brings us back to this question then. Short of that, they're asking for something. What is it that could be done that you're saying there isn't anything, but couldn't there possibly be some things that could be helpful short of rerouting in the pipeline? I suppose in a theoretical sense, yes, but these petitioners haven't suggested anything. And I think the other key here is to look at all the implications. I mean, suppose, for example, that it was determined on a reconsideration that because of where these pipes were laid instead of being laid somewhere else, a lot of fish are dying, more fish than would have died if they had built it somewhere else. Couldn't you do something like somewhere else or in the area or in a way of protecting the fish or a way of trying to prevent fish elsewhere from getting in trouble? Right, basically help the species someplace else. And I think that's exactly the reason why we didn't make the argument that the EISA claims were moved. But with respect to the other claims. But then it's related to the EIS as well because it's related to what's in the EIS in terms of how the decision was made in the first place. I think that the EIS claims, again, the way these petitioners have framed them, are really about what is the harm from actually constructing the pipeline. Could I just jump in? I want to bring you to something that didn't get discussed by the petitioners, but it goes to this issue. There's a great debate in all these briefs about groundwater versus surface water and the taking of millions of gallons of groundwater and the effect that may have on the species, right? Now, it seemed to me that if there was a remand, wouldn't there be some data on all this? Because they say, well, there should have been more evaluation of that. The federal respondents say that's just hyperbole. And it sounds like a lot, hundreds of millions of gallons, but it really doesn't have any impact other than in the Colorado River watershed where it was dealt with. Okay, so now the pipeline's built. You took the groundwater, you put the groundwater back. Isn't there some data that shows whether it had any effect or not? I don't know if RUBY did any surveys like that, but Your Honor is right that it has happened. And if, for example, some stream of importance to endangered species had been to water just because of the extraction of groundwater, I would think that petitioners would know about it. My clients don't have any knowledge of that having actually happened. As I understand, there's nothing in the biolog of that groundwater. Is that right? The biop acknowledges that there would be groundwater withdrawals, but it does not- There's nothing about the impact of it. That is correct. And all we have about that is some post hoc statements by you, the lawyer, about why it didn't matter. And if we're to go back and have an actual investigation of it now, I gather that the groundwater issue dealt again primarily with the building. Is that right? And not with anything that's occurring now? Yes, that's right. The withdrawals were all for testing the pipeline and also for controlling dust. But if one was to discover, for example, that as a result of the groundwater taken, if the groundwater there was actually less water flowing and there was an impact on the fish, again, couldn't one come up with some mitigation measures or something? Or how do we then equip to affect any impact on the fish as a result of something that wasn't considered originally? I just want to- we did not make an argument that this ESA claim would be moved. Okay. And so the question really is on the merits. Was Fish and Wildlife arbitrary and capricious for not directly addressing that in the biological opinion? And I think the court has to also remember the context in which Fish and Wildlife was operating here. There were- the experts at the agency had a lot of concerns about what would happen to the fish in the Colorado River from these surface water withdrawals. And the amount of flow in Colorado is a big issue for those fish. But what's totally absent in the record is any indication that groundwater withdrawals would be a threat to these other fish species, the non-Colorado- Isn't that the problem, that there was no consideration of the groundwater withdrawals and we don't know? Well, there's nothing explicit, but I will point your honor, for each fish species, the biological opinion has a threat section which identifies likely threats to species. And they talk about things like sedimentation impacts and grazing impacts and those sorts of things. But completely absent from that is any suggestion, which Fish and Wildlife prepares those based on the biological evidence that they have and, of course, the citations are at the end of the biological opinion. Completely absent from that is any suggestion that groundwater withdrawals might be a problem for these fish species. And I think it was reasonable for them to not explicitly state that. Clarify for me how this process works, because if I understand the arguments, it goes something like this. Fishers say that FERC did a biological assessment, and in that assessment, they identified groundwater depletion as a potential problem to the fish. And then it falls to BLM to decide whether it is, or to the Fish and Wildlife Service to decide whether that is a sufficient threat that there should be consideration of that in the biological opinion. Now, they say you had an obligation because it was identified as the biological assessment. And if I understand it correctly, you say that no, our agency expertise is what counts here, and even though it sounds, they may have thought there was a problem, we decided there wasn't a problem. Where is the burden here? Whose burden is it? Is it your burden to prove that it isn't a problem and therefore to put it in the biological opinion, or is it the petitioner's burden to come up with evidence to show that you failed to consider something that you should have considered? I want to correct one thing before I give my answer, which is actually that the biological assessment mentions the groundwater withdrawals, but it does not suggest that there would be any adverse impacts to fish species. And I think that that's important because if the biological assessment had actually suggested that, or if there was some scientific literature that suggested that groundwater withdrawals were a problem for these fish species, then I think the burden would fall to Fish and Wildlife to explain why these particular withdrawals would not cause jeopardy to the fish species. But here, where there's no suggestion, no scientific suggestion whatsoever, the issue of groundwater withdrawals was also known to the parties whenever the EIS was published, and no one suggested in those comments that this would be a problem for listed fish species, that at that point the burden really comes to petitioners to come forward with some evidence to show why the Fish and Wildlife Service should have actually considered. I know that we've gotten you off your mootness point, but since the Endangered Species Act is the one place that we seem to have agreement that there's not a mootness problem, maybe productive to talk about that for a while. What about that conservation action plan issue, which seems to be the major legal issue in this case? Well, I want to start from this position, ultimately. Is your position that it doesn't matter whether it's enforceable under the Endangered Species Act as long as it's enforceable in some other way by some other people, or what? Yeah. Is it enforceable, or what? Essentially, there's nothing in the regulations or in the Endangered Species Act itself which requires the conservation action plan to be enforceable under the ESA. The ESA says it's enforceable in the abstract, but does it have to be enforceable if it's going to be considered as part of the no jeopardy decision in the bylaw, which is what happened. In determining whether or not to look at a cumulative effect in a biological opinion and to weigh that as part of the jeopardy analysis? Can you point to that cumulative effect? Can you point to any other case in which something like this was considered to be a cumulative effect, something that was contemporaneous with the decision, but part of the same complex of issues and with the federal agency rather than private? Is there any example of that? How it was met by a cumulative effect? I am not aware of any example like that other than the Selkirk case, which... Selkirk was enforceable as part of the taken... It was part of the incidental take statement, or at least some part of the conservation action plan there was incorporated into the incidental take statement. And there's another problem, too, which is this does not seem to be not only is it not enforceable, but it's awfully vague in the sense that there doesn't seem to be any commitment by Ruby to actually commit the money to it or all of the money to it or to do it at any particular time. Well, actually, there is a timeline. It is within five years. I thought it had to begin within five years. Yes, I think that that's correct. As a matter of fact... All the fish would be dead by then for all we know, right? Well, I think if you actually read the biological opinion and its analysis of the effects of the action, you will see that the effects of the action are, in fact, quite minor and quite temporary. And, yes, Fish and Wildlife did consider this conservation action plan whenever it ultimately reached its Jeopardy! No Jeopardy! conclusion, but that was required by the regulations. And it's one of the factors that Fish and Wildlife has to look at whenever it is making that Jeopardy! No Jeopardy! call because there may be, for example, negative adverse effects coming in the future from some state or private actor, and the regulations contemplate that, and Fish and Wildlife should look to that. But there could also be positive effects coming down the line for the fish, and so that was appropriately considered. And I want to remind the Court that there's no precedent either for what the petitioners are asking the Court to hold. Ultimately, what this comes down to is a dispute about the legal category that the conservation action plan should be put in. There's no dispute. But it has consequences. It isn't simply that, because where it is considered seems to determine what can happen if it doesn't happen. In many ways, as I understand it, I mean, there's a citizen's question, but in addition to that, there are criminal penalties, and there are fines, and there are other things that Fish and Wildlife could do if it weren't complied with that the other agencies can't. And moreover, they're all different agencies with different interests, and some of them might do it and some of them might not do it. And why doesn't that matter? Well, I think that the regulations, first of all, contemplate that cumulative effects are not something that would be, quote-unquote, enforceable. Just because a cumulative effect is some state action that's going to happen to benefit fish down the line, Fish and Wildlife makes the determination, is that reasonably likely to occur? And if it is, then it should be considered. Is there another case in which affirmative benefits were considered cumulative effects, even just that narrow category? I cannot come up with one off the top of my head. It's a very peculiar thing to have done, is it not? I don't know that it's that peculiar. I think that it does, in fact, come up quite a bit that you have these planned beneficial effects. That are considered as cumulative effects and nowhere in the plan of action or in the incidental case statement itself. I'm sorry. I understand that it's not unusual to have conservation plans of this kind, but we don't seem to have any instance in which these beneficial conservation action plans are included only as cumulative effects and not in any way that is directly enforceable under the Environmental Species Act. There are no cases that have come up dealing with that exact issue, but I don't know that it's unusual for the Fish and Wildlife Service to do it this way. I mean, they obviously have their lawyers and they discuss this as evident in the records. Aren't there plenty of documents that somebody could find, but it never happens? Presumably, yes. I don't know of any. I personally do not. I just wanted to give you the site. You said the regulations contemplate that cumulative effects would not be enforceable in the manner in which the petitioners are asking. What regulation? It's the 402.02, the definition section, talking about what cumulative effects are. And it's future state or private actions that are reasonably certain to occur. And then there's nothing that requires, for example, in the regulation about reinitiating consultation, which is 402.16, there's nothing that suggests that consultation would have to be reinitiated if a cumulative effect that was anticipated didn't happen. Okay, so it's the absence of a requirement that you're relying on to suggest that there's no requirement that it be directly enforceable by the Fish and Wildlife Service. Is that right? That's right. Or by citizenship? That's right. Okay. So I asked a question to the petitioners that could point to the source of the authority that suggests that this is required, that enforceability under FERC or enforceability under the ROV is not sufficient. What do you have to say about that? Is there any precedent for what speaks directly to that issue? I don't think there's anything that speaks directly to that issue, that these things have to be enforceable in some way, only in the sense that the enforceability matters to the idea of whether or not these cumulative effects are reasonably certain to occur. And I also think it matters in a bottom-line sort of analysis. And what is it that we're talking about here? Ruby has committed money to helping these fish species, to doing basically some of the wish list of projects for these state and federal agencies that they want to do to take these beneficial actions to help the fish. And the Center for Biological Diversity doesn't dispute the ultimate no jeopardy conclusion. It's all about what is the legal box that these actions should have been put in. And the only effect seems to be whether or not there could be another lawsuit down the line or a re-initiation of consultation. Or enforcement for an incidental case and so on. That's right. By the Fish and Wildlife Service. Yes. So it's not just what you said. It's not simply consultation or citizens. It's also whether if there was an incidental case as a result. That's right. Although I don't think if you look at the regulations, the way this process is supposed to work is Fish and Wildlife makes the call on jeopardy, no jeopardy, based on the project, scheme of effects, baseline, all of those things. And then it issues its incidental take statement, which places additional terms and conditions on a project to minimize the effects of the project on fish species. And I don't think that these particular effects would fall into that box of minimization anyway. For example, if you read this incidental take statement, it's all about timing of the work in these waters, the fish screens, those sorts of things that would minimize the effects of the project. Whereas this is something different. This is benefiting the fish species elsewhere. So within the action area, as that is a term of ours. I'm fascinated in the observation by your opponent that cumulative effects are supposed to be not involved in federal activities. I think that these are ultimately RUBY's actions. As a private actor, they have committed to do them. Yes, they agreed to do them and promised that to FERC and to BLM. That's a federal action. Well, I don't think so. I think that it really is RUBY paying the money. And in some cases, it's states that are going to be overseeing the actual project. The agreement. First of all, I gather that it was Fish and Wildlife that came up with the projects. They did. They suggested the list. Right. And the commitment is to them. And if there's going to be enforcement, it should be by them. Not by them, but BLM or by FERC, right? Yes, that's right, Your Honor. And that's not a federal action? No, I don't think that it is. And it's because of the voluntary nature of these agreements. Voluntary in the sense that RUBY agreed to them. I want to talk a little bit about the consultation. If it's voluntary, I'm going to do it. And voluntary, I'm going to agree with you to do it. And you have the power to do something to me if I don't. I don't think that that makes it cross the line into being a federal action for purposes. That is part of the definition of a commitment. Yes. Do you want to talk a little bit about the tribe issues? Yes. I will. Yes. I appreciate the suggestion. Here, BLM made reasonable and good faith efforts to identify the historic properties of interest, both to the Fort Bidwell tribe and to the Summit Lake Paiute tribe. And with respect to Fort Bidwell, there was a lot of consultation that went on with respect to Beryl Springs. In fact, BLM talked about the Beryl Springs TCP at depth in the ROD and about the efforts to attempt to identify another route through or around the Beryl Springs TCP. The Big Valley area that the tribe has now identified is nowhere identified in the record that they ever brought that up to the agencies. They have one citation in their brief to attempt to show that this was brought to the attention of FERC and BLM. And it's a very general letter where the tribe requests consultation on properties in, I believe, southeast Oregon is the terminology that was used. And that's just simply not enough to engage the agencies on this Big Valley area, especially when the ethnography that was produced for the tribe did not identify the Big Valley area as a TCP. I want to talk a little bit about the timing issue of the MOA and the ROD. And here I think the big key is that when BLM signed its ROD a few days, about two weeks before the MOAs were actually signed, it made that ROD and the execution, the construction contingent upon all the parties to the MOAs actually coming to an agreement about what the process would be for resolving the adverse effects and identifying historic properties under the NHPA. And I think that certainly the tribes can't show any harm to them from that short difference in time. And with respect to the Summit Lake Paiute tribe and the reroute decision, I think that the record shows that BLM and FERC both tried to engage the tribes. And it was much more than just sending the tribes letters and engaging in public meetings. There were also a lot of phone calls. We've reproduced some of those logs in our excerpts of record. And the tribes submitted comments. They could have submitted those comments in private so that they wouldn't be made public. And you're talking about after the route decision was made or before? Before. Up until this point I've been talking about things that were all before the decision was made. The reroute or the original route? The original route. But there's a lot of case law that seems to say that the tribes may have reasons not to want to be specific until there's an actual route. And, therefore, the obligation is on the agencies, not on the tribes, once there's been some generalized concerns raised. And there were certainly generalized concerns raised. And what really happened here is you hired a lousy or would be hired, apparently, an inept investigator who never really figured out where the problems were. So why is that a tribe problem? Well, it's not the tribe's problem. BLM did, in fact, whatever the merits were of the original consultant who did the Class I and the Class III surveys, the literature surveys and then the sort of boots on the ground surveys, Ruby then hired a new consultant to redo all of that work. And in that process also did... It was after the VC FAIS was issued. I think that that process had started before the FAIS. It wasn't available at the time of the FAIS. No, that is correct. But what was available were the comments that the tribes had made, as well as BLM's efforts to reach out to the tribes. And I think that... They were actually told here today that they're not concerned about that anymore. They agree that that's essentially their problem is the reroute. So why don't we talk about that? Sure. And I think that there with the reroute, obviously BLM went to great efforts to both identify the property appropriately and to resolve the adverse effects in consultation with the Summit Lake Paiute tribe. And there were four-site visits. There were numerous face-to-face meetings, as explained in the record. And, again, I think this all sort of comes down to what release could there be? Even if the court ordered more process for the tribe, what release could there be? Was there an obligation to amend or supplement the EIS at the point in time where you made the decision to reroute the pipeline? Did that trigger the obligation to do a supplement? I don't think it is. BLM explained it in its DNA. And I'm sorry for the alphabet soup, but the actual terms are escaping me at the moment. The reroute was not a substantial change to the project. That's one trigger that could trigger a supplemental EIS. I have the reg right here. I'm looking at it. What's a substantial change and or what's a new circumstance for information relevant to environmental concerns? Isn't human environmental concerns one of the concerns? Yes, they are, Your Honor. So what are substantial changes or significant new circumstances? I think a substantial change would be, for example, routing the pipeline through a totally different area that hadn't been looked at at all in the FEIS. I mean, another way to look at the same problem is that at some point, I think in March of 2010, BLM recognized that there really was a TCP here and it really was a problem. At that point, it didn't have an obligation to do anything. In other words, isn't that the new information? Not the new route of the pipeline. It's the information you learned that caused you to reroute the pipeline. That's right. And perhaps if BLM had decided to stick with that route and stick with the original route and run it very close to the areas that the tribal members had identified, that may have been new information that would have triggered a supplement. But that's not the question. The question is if you had done it. I mean, the point of FEIS is you're supposed to consider an alternative. So at that point, you could have considered in some organized way the alternative. Because that's really what this argument is about. They're saying, look, you didn't reroute it to the right place. You could have rerouted it somewhere else that would have been no more trouble for you and would have been more preserving of the objects and areas that we wanted to preserve. And instead of doing that, you basically do whatever Ruby wanted. And so the whole point of the EIS process is really to kind of slow that kind of thing down and say let's do an orderly consideration. Right. But I think that here where you have them making a minor reroute that avoids the resources. But that's the question, not the answer, right? Whether it avoided it. That's the dispute. That's the fight. Right. But you have to remember what the context of that fight is. And that is that the tribe doesn't claim anywhere that any of the resources that they identified to BLM were not included in that TCP as BLM identified it. They don't dispute that. Their argument is that the whole sort of ethos of the place is important and would be harmed by the reroute. And would be less harmed if it were somewhere else. And it would be less harmed if it were somewhere else. Not quite far away. A teeny bit away. That's right. But what the law says under the NHPA is that BLM has an obligation to consult and to potentially minimize adverse effects to the features of a traditional cultural property that make it such. Not to the entire landscape. And this court has held that in the Tay-Moak case. But in this case, the reroute didn't take you through. It was only general statements by the tribe that there were TCP present in the reroute. But no real evidence of that. Is that right? That is right. So you have two. So maybe that solves you the problem under the NHPA. But that doesn't necessarily solve the problem under the NHPA to do maybe to do a supplement. Well, like I said, if they had stuck with that original route, then yes, maybe you would have to do a supplement because there would be new information that BLM had about the effects of the pipeline. I don't understand. But since they avoided it. Just a minute. You're ahead of time. I don't understand your argument. Because the trigger for the supplemental EIS would be the information. Not the decision made as a result of the information. Because the whole point of the supplemental EIS is to inform the decision. So it seems totally backwards to say that it depended on what decision was made whether they had to do the EIS. There is a case cited in my brief, and I really apologize that I don't remember the name of it. But it's from this court. And it's from, I think, the early 80s. It was a core case where some historic property resources had been identified in some sort of dredging context, I think. And the agency then changed the project to avoid harming those resources in the same way that we have here. And the court said that no supplemental EIS was necessary at that point. Okay. You are ahead of your time. Thank you very much for your argument. It's helpful. Thank you. May it please the Court. I'm John Bryce on behalf of Ruby Pipeline LLC, the intervener in this case. I would just say that the case that she was referring to, the Eunice v. Marsh, is cited in both our brief and the government's brief. Was that a case where there was a dispute about the actual decision that was made? The actual what? In other words, I don't understand. I did read Marsh, but I am not now remembering it. But I don't understand the logic of saying that depending on what decision is made, it's determined whether or not you have to do the EIS. Well, Your Honor, I think the more dispositive point is that it's whether the information makes a difference in what was known before in terms of the fact. Well, that's not what the dispute is. No, not at all, Your Honor, because this whole history of the implementation and consultation was about where is the pipeline going to go, and this vast area in Nevada and Utah and California and Oregon was shared and regarded as aboriginal territory by 40 tribes. And the issue was, well, if it goes here, is it going to disturb artifacts or things that were important or sacred to all these tribes? And as for each of these tribes, the inquiry was that's what it was about, and the concerns that were expressed was we don't want it there because it's going to do that to us. Here we have what the effects are no different whether the area is formally identified as a TCP. It's the same issue. There are features of the area. But apparently the BLM didn't even know that there were features in that area until they went out and looked at them after the EIS decision was made. Are you saying that there were features of the new area where the reroute goes that essentially make it the same as the original? I'm saying the inquiry all along the route with respect to the different tribes, and some of them overlap, was where are the features that you're concerned about, where are they located? And with many tribes, many tribes came in and said, well, you know, this is what worries us. This is what worries us. This is where we go. This is what is important to us in a location kind of thing. The Sonoma Lake tribe never did that. They refused to do that. And then when they finally, after the EIS, they waited until the EIS in order to tell BLM finally, well, you know, we are concerned about things that are located here, there, and everywhere. And at that point, the issue was, well, let's identify where they are and we'll go through the NHPA process to resolve them. But the effects are, there are new effects within that location, but it's not any different than all the effects that were analyzed in a general way in the FDIS, because the whole issue was about what do you do when you come across these things? And the other aspect of this is that sometimes. I'm really having a lot of trouble with your argument. The EIS considered specific routes as alternatives, right? That's correct. And because there was no awareness of this particular problem, it wasn't taken into account with regard to the routing. Well, there were efforts made to walk, there were pedestrian surveys of the whole route. Very bad ones. They were done and they were redone. And a lot of them were done by the time the EIS was. But they weren't considered in the EIS because they said they were not done. Many of them were, Your Honor. This one was. What's that? This one wasn't. Well, no, this one wasn't. And partly it's not attributable to a defect in the surveys. It's because the side who knows uniquely where these features are located would not disclose them. The case law, I mean, I understand that's a problem, and I was surprised to learn, but it is true that the case law and the handbook account for that and regard it as a legitimate reticence given, I gather, some history of plundering and so on when things are revealed and therefore place the burden on the service and on BLM and on the proponent of the project, I guess, at least when very general concerns have been raised and they were. Is that not what the case law says? The case law says that the agencies are to be engaged in government-to-government consultation with an awareness and respect for the views and beliefs and the culture of the tribe that they're dealing with. To do the investigation rather than ask the tribe to come forward. Well, what their obligation is to make a reasonable effort to identify, and in this case. And what is hiring, having you hire an incompetent investigator doing that? The. I mean, I'm sure you didn't go with incompetent hiring, but it turned out to be incompetent. Well, there were multiple different ways to collect information for BLM and its consultation. The professional surveys that you're referring to were considered to be of a type that needed to be rechecked, and that process going forward. And they were eventually found not to have any glaring errors. There are other avenues. Nobody ever identified this TCP and didn't find it. Well, Your Honor, the features, the pedestrian surveys in the Sevast area are not going to see everything. The whole NHPA process and the memorandum agreement is set up to deal with what you find as you are constructing, for example. Some of them are underground. So one of the problems here is that we're jumping back and forth between the NHPA and the EIS. So I think what you're saying is that through the new consultants and the pedestrian surveys and so forth, you've satisfied the NHPA, and things really did sort of change as you progressed and new things were done and you took care of that problem. But you're also saying, I think, that what you learned in the course of that would not have ended up changing the EIS. So because the EIS contemplated TCP areas and these problems originally, and it's just what happened after that is you identified more specifically where those TCPs were, and the pipeline was rerouted to account for that. Essentially, and the EIS has a perfect example of that in the case of the Fort Goodwill, because the barrel-strength TCP was something that that tribe had brought to the attention to DLM and the FERC, and through the FDIS they heard and analyzed what the tribe's concerns were and determined that there would be efforts being made to reroute and avoid that, minimize as much as possible impacts on the features that were in that TCP. Okay. So your time is running out. There are two things that I would like to hear something about. One is the conservation action plan, because that is something that our clients were directly involved with, and the other is your movement. Well, on the conservation action plan, the ESA regulations clearly contemplate that the Fish and Wildlife Service is supposed to evaluate cumulative effects. It's also supposed to evaluate the effects of the action and making its jeopardy determination. The Fish and Wildlife Service did that here with respect to the conservation plan. They looked at the effects of the action and concluded that they were extremely minor, and then they considered the effects of the plan and cumulative effects to see if there was anything that was going to change about that. The process of making a jeopardy determination depends on the Fish and Wildlife Service applying its expertise to determine what the status of the species is, what the environmental baseline is, in other words, what the environmental setting is, and then the effects of the actual action, and then the cumulative effects of anything that's reasonably certain to occur as non-federal. Those are the four elements here. Enforceability is not one of them, and it doesn't relate in a substantive manner to what the jeopardy analysis was, and the regulations don't say that. It's relevant to the cumulative effects, i.e., if you have something that is enforceable one way versus another way. First of all, there's the problem whether there is a cumulative effect, given the fact that that deals at least in part with the federal action exclusion and also with other things that make this at least a very odd cumulative effect. But secondly, even if it were a cumulative effect, why isn't the question of whether it's enforceable by the expert agency here as opposed to in some other way relevant to the cumulative effect status? Well, you have to understand first that the jeopardy opinion is issued by the Fish and Wildlife Service. You know, it's a determination of the Fish and Wildlife Service of what their opinion is, but it doesn't bind the action agency. So it's not the Fish and Wildlife Service. Well, it does have to be in the incidental status. Well, but the other handbook provision says that projects like these conservation action projects cannot be part of the incidental take statement because they are mitigation that occurs not directly to minimize the actual take that will occur during the action. These conservation projects are going to be in different locations and they don't affect take. So, and to go back in terms of the federal nature of this, these projects, these habitat improvements, were things that the Fish and Wildlife Service had identified, but that doesn't make them a federal action because the whole purpose of excluding the federal action is to I think there was an agreement entered into with two federal agencies enforceable by the federal agencies. That's not a federal action. But the fact that the agreement, well, the agreement was between, the agreement was between RUBY and the commitment was to RUBY and the Fish and Wildlife Service that RUBY would fund certain actions. But in itself, it's not a federal action for purposes of the ESA. In other words, the purpose of excluding a federal action from a cumulative effect is because it's going to, likely future federal action is going to have to go through its own consultation and that doesn't have to happen here. So, maybe I'm oversimplifying this, but basically as I understand it is you agreed to do these various projects in order to get the pass in terms of the incidental cost that occurs during the construction of the project, right? It was part of RUBY's extensive outreach. I know, but I mean, so then the issue becomes, well, what if you don't keep your word? Who can enforce that? Well, now it's, yes, right, and BLM, both BLM and FERC, who are the action agencies, they control RUBY's activities with respects to projects. The Fish and Wildlife Service doesn't directly control it, it only submits the opinion. With respect to the incidental take, and you say this is irrelevant, but it is relevant, because presumably the amount of incidental take, the cumulative effect has nothing to do with that? The way the Fish and Wildlife Service could enforce the incidental take statement is to bring an enforcement action against the person who is alleged to have taken the species. Okay, but the determination, excuse me, of the incidental take, not taking into account what was considered to be the status of the species, including the cumulative effect. Well, if there's an enforcement action that the incidental take is exceeded, then the issue is- That's not what I'm asking you. I'm asking you whether the determination of the incidental take did not take into account the supposed cumulative effect. That was the point I made just a few minutes ago, Your Honor. You said it didn't, but I'm asking you how do you say that, why is that so? Because the incidental take is sort of a safe harbor provision, and it immunizes activities that otherwise would be a take under section. And it doesn't have anything to do with the determination of the amount of the incidental take is not relevant. It's not determined in part by the understanding of what kind of danger the species is in, which has something to do with the cumulative effects in general? Well, it's based on what the effects are, but that doesn't mean- but the likely cumulative effects, if they are independent on these non-independent projects, then an independent- Well, it's the determination of the incidental take. Well, isn't the take over with? The incidental take is done, isn't it? Well, yes, the incidental take is done, and also Ruby has funded almost all these projects, so some of them are underway. And the funding goes to non-governmental organizations to do certain activities, so that- We're trying to figure it out. I mean, we can all agree, I think, that the incidental take has occurred. The project is done. I asked some questions earlier about whether there's any data on how much take there was, and nobody seems to know whether there is any data, or maybe you do. But, okay, it's over. That's occurred. Now the question is, who gets to hold your client's feet to the fire when it comes to these promises that were made in order to get that safe harbor? And to answer that, is it enough that the ROD is enforceable, or the FERC certificate is at risk? They want-the petitioners want to be able to bring a citizen suit, and they want the Fish and Wildlife Service to be able to directly enforce your client's failure to perform these activities if that were to occur. I think that's what this dispute is about. But the conservation action plan was not to get the safe harbor, because that's not the way the Fish and Wildlife Service analyzed it. This goes back to it's not part of the incidental take. The incidental take, the safe harbor is determined by- I understand Judge Smith to be saying-we can argue about that back and forth, but Judge Smith is saying incidental take is over, forget the incidental take. Just worry about the fact that there was an agreement made, which in some manner or other definitely went into the bio-op, which in turn went into the final decision. And the question is, what if you don't do it? And the answer is that it is, under the regulations, it is a cumulative effect, just like all the other cumulative effects that were analyzed, some of which are beneficial, some of which are detrimental. Any questions? Sorry? You're not answering the question. The question is, does it matter? I mean, the answer to what if you don't do it is, there cannot be a citizen suit and there cannot be the enforcement mechanisms that are set up by the ESA that the Fish and Wildlife Service controls. And the question is, does that matter? That's the question. Well, and the first answer is that BLM, which does have continuing authority over the right-of-way or the certificate, can enforce it. It's enforceable if it's necessary. So that's the first answer, and it should be enough. The question is, what did the Fish and Wildlife Service, in analyzing this, do anything that's not what they always do? Very briefly, because you're out of time, with regard to the mootness question. Yes. First of all, you as well are not arguing mootness with regard to the Environmental Endangered Species Act. That's correct. Including this question. Sorry? Including the question we've been talking about. I'm sorry, Your Honor. Including the question we are talking about. Yes, correct, Your Honor. I'm sorry, Your Honor. I just went on here. That's correct, Your Honor. But our submission on mootness has to do with the alternatives, because FERC is now in exclusive control of whether the pipeline could be relocated. And here, but there are hard-look claims under NEPA, human effects impacts on water-border crossings under these court's decision. This claim is limited to the alternatives. That's it. To the set of issues that we've identified in our motion that depend on, you know, consideration and evaluation of an alternative. That's the difference between the hard-look claim. There could potentially be enough mitigation available for a new analysis of human effects that might make a difference. We're not arguing that that's moot. The issue is that if DLM needs to reevaluate an alternative, there's no logical nexus between, you know, what it might determine and impacts on where the route is now, which, you know, are not going to be protected anymore. They would be known, and they're mitigated. No petitioner here is making any challenge that the mitigation for the route itself was inadequate or underestimated. So. Okay. Thank you very much for coming. Mr. Glistenstein, are you doing the rebuttal? We'll give you four minutes. Thank you, Your Honor. I appreciate the time. Could you respond to that last point, i.e., that with regard to the alternatives in particular, there is no available mitigation or, put another way, it's more like the feral pigs on the island, i.e., it's over. Over, over. Your Honor, I think that under the Court's precedent, there's just no basis for distinguishing the alternatives challenge to the other kinds of challenges. As a practical matter, I think the Court could recognize that the prospect of digging this pipeline up and relocating it may be more far-fetched, but I think Your Honor was absolutely right in suggesting that a deficiency in an alternative analysis could easily lead to a conclusion that there should be additional mitigation. For example, some of the briefs focus on the impacts on sage-grouse habitat. The declarations, the standing declarations, contrary to the government council's representation, do not simply focus on immediate construction impacts. They talk about long-term chronic effects. Just to give you one example, page AD-209, CBD's declarations, AD-202 talk about long-term effects on sage-grouse and other habitats. So I think as a legal matter, there's certainly no reason why a deficiency could. Well, I mean, at this point, why wouldn't it make more sense if there was a problem, even if there was a problem in the alternative analysis? Maybe this is the answer. You really don't want to do the alternative analysis over again because nobody really wants them to move the raft. So it's not that you really want them to do the alternative analysis over again. What you want them to do is look at the raft that they did choose and did build and take a hard look at it with regard to sage-grouse and everything else. So why are we worrying about the alternative analysis? Your Honor, I think that's an entirely reasonable approach. I was trying to answer the question in terms of what I think the strict legal answer would be, that the case law doesn't support there being a strict legal distinction. But I think looking at the impacts and saying some of them are not actually considered, including cumulative effects, which absolutely is part of the argument. So I respectfully submit that that should be the focus of the court's analysis under NEPA. If I could turn to the ESA, because everybody concedes that one's not moved, and I think the government's answer to that question highlights where there at least has to, I respectfully submit, be a remand. It's rather telling that in the entire history of Section 7 jurisprudence and the thousands of consultations they can't come up with a single example of where this has been done. And the one they did come up with, which was the Seltzer case, they made it enforceable under the ESA, a determined condition. And in answering Your Honor's questions, almost everything that was said by both Ruby's counsel and government's counsel was post hoc rationalization in its purest form. None of this is in the administrative record. There is no explanation for why they could deviate so substantially from the approach they've taken on these issues. And, Judge Breslau, it's not simply a peculiar approach and a novel one in the history of Section 7. It's also an illegal approach. And at least it has to be addressed as to how it's supportable by the regulations. If you go to the government's most astonishing claim, which is that something required by BLM and FERC, and that is pursuant to a Memorandum of Agreement with the Fish and Wildlife Service, is not a federal agency action, if Your Honors would take a look at, at some point, the definition of agency action, which is in the regulations, 50 CFR 402.02, it is any kind of action authorized, funded, or carried out in whole or in part, including actions intended to conserve listed species, rights of way, et cetera. If you were to rule that this is not a federal action, you would be wreaking havoc on Ninth Circuit precedent under NEPA and ESA. At least they have to explain this in the record. And the other citation I would give you, particularly on Judge Smith's question, if you look at the addendum at page 29, it talks about interrelated actions that have to be analyzed as part of the action by those for which there is a but-for clause. Ruby would not be doing these things, as they acknowledge in response to Judge Smith, without this pipeline being approved. And the other thing they say, this is the addendum in 84 and the addendum in 90 and 91, is that conservation actions like this one have to be part of the agency action, not cumulative effects, and considered as part of the action impacts and therefore enforceable under reinitiation. The lawyers, which we were told about, the lawyers for the agency said this was illegal, and we have those citations in the brief. The lawyers specifically pointed out that if you're going to go this route, you cannot consider these impacts under the biological opinion. If I could just make one final point, government counsel said that we don't challenge the jeopardy determination. The official website said these were serious impacts. The biological opinion specifically relies, particularly on the trout and some of the Colorado fish and sucker species, on these conservation actions to reach a no jeopardy conclusion. You cannot say based upon this biological opinion they would have done that Without looking at these impacts, a remand is absolutely necessary. We respectfully submit on this issue for them to sort out how this is legal and what the ultimate rationale for it is, at minimum. Okay. Thank you all very much. It's been a long but useful argument, and we appreciate it very much. You all were extremely helpful. And we are in recess. Thank you very much.
judges: Smith, Berzon, Smith